Teresa Renaker – CA State Bar No. 187800
Cassie Springer-Sullivan – CA State Bar No. 221506
LEWIS, FEINBERG, LEE, RENAKER & JACKSON, P.C.
1330 Broadway, Suite 1800
Oakland, CA 94612
Telephone: (510) 839-6824
Facsimile: (510) 839-7839

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LISA FRITZ,                                     )
                                                )
             Plaintiff,                         )   Case No. C07-03587
                                                )
    vs.                                         )   **COMPLAINT (ERISA)**
                                                )
KAISER PERMANENTE MEDICAL GROUP                 )
LONG-TERM DISABILITY PLAN,                      )
                                                )
             Defendant.                         )
_____)

## JURISDICTION

1.     Plaintiff brings this action for declaratory, injunctive, and monetary relief pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to ERISA § 502(e) and (f), 29 U.S.C. § 1132(e) and (f), and 28 U.S.C. § 1331.

## VENUE

2.     Venue lies in the Northern District of California pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plaintiff resides in this District and the breaches alleged occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District.

**INTRADISTRICT ASSIGNMENT**

3. This action arises in Alameda County since Defendant Kaiser Permanente Medical Group Long-Term Disability Plan does business in part in, Plaintiff resides in, and some of the breaches alleged occurred in Alameda County.

**PARTIES**

4. At all relevant times, Plaintiff Lisa Fritz ("Ms. Fritz" or "Plaintiff"), also known as Lisa Brewer or Lisa Brewer Fritz, was a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Kaiser Permanente Medical Group Long-Term Disability Plan ("the Plan"). Plaintiff resides in Oakland, California.

5. At all relevant times, the Plan was an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1), sponsored by Kaiser Foundation Health Plan, Inc. ("Kaiser"). At all relevant times, the Plan offered, *inter alia*, long-term disability benefits to employees, including Plaintiff, through an insurance policy issued and administered in part by Metropolitan Life Insurance Company ("MetLife").

6. At all relevant times, Kaiser was named as the Plan Sponsor. Therefore, under ERISA § 3(16)(A)(ii), 29 U.S.C. § 1002(16)(A)(ii), at all relevant times Kaiser was the administrator of the Plan.

**FACTS**

7. Ms. Fritz, a 48 year old woman, began working as a medical social worker for Kaiser Permanente on October 10, 1988.

8. Ms. Fritz's job duties as a medical social worker included conducting psychological assessments of incoming patients, counseling patients and their families during hospital stays, educating patients and their families about post-hospital rehabilitation, and occasionally providing post-discharge case management.

9. In performing her duties as a medical social worker, Ms. Fritz was required to, among other things, walk from patient to patient; sit for up to one and a half hours at a time when conducting intakes with new patients, which could be more than once per day; attend two-hour weekly meetings, where she would sit the entire time; and push patients in wheelchairs. Ms.

Fritz worked eight hours a day, five days a week.

10. On July 2, 2001, Ms. Fritz, while at work, slipped on some spilled water as she was exiting the cafeteria in the Kaiser facility in Vallejo, CA. In falling, Ms. Fritz's right knee, which was first to hit the floor, broke her fall.

11. Later on July 2, 2001, Ms. Fritz saw Dr. Wilkes at the Minor Injury Clinic for pain in her right knee, left wrist, left shoulder, left ankle, and lower back. She was diagnosed with low back strain, left ankle sprain, and left shoulder strain.

12. Ms. Fritz did not work from July 3, 2001, through July 26, 2001, due to her poor mobility resulting from the injuries she sustained in her fall.

13. On July 10, 2001, Ms. Fritz again saw Dr. Wilkes in the Kaiser Department of Occupational Medicine. Dr. Wilkes noted Ms. Fritz's discomfort and difficulty walking and diagnosed her with a low back spasm resulting from her July 2, 2001, fall.

14. On July 12, 2001, Ms. Fritz was seen by Dr. Brian Knapp at the Kaiser Department of Occupational Medicine. Ms. Fritz was found to have "marked extension dysfunction," tenderness in her right leg, and poor mobility.

15. Ms. Fritz began a course of physical therapy after her July 12, 2001, appointment. Her physical therapy included personal instruction from a physical therapist, attending a lower back class, and performing exercises at home, among other activities. While the specific exercises have varied, Ms. Fritz has continued a course of physical therapy throughout her treatment.

16. Ms. Fritz returned to work on July 27, 2001.

17. Ms. Fritz continued working and experienced slow but steady improvement in her pain and overall mobility until March 3, 2002. On March 3, 2002, while on a business trip, Ms. Fritz experienced severe pain in her lower back.

18. On March 5, 2002, upon returning from her business trip, Ms. Fritz visited Kaiser's Department of Occupational Medicine, after which she remained off work through March 11, 2002.

19. On March 11, 2002, Ms. Fritz saw Dr. Knapp and was preliminarily diagnosed

COMPLAINT

1 with grade II spondylolisthesis, severe loss of disc height at L5-S1, and sclerosis.

20. On April 19, 2002, per Dr. Knapp's referral, Ms. Fritz was evaluated by Dr. Matthew Smith. Dr. Smith confirmed her diagnosis of grade II spondylolisthesis.

21. Dr. Smith suggested that Ms. Fritz was a good candidate for fusion surgery, noting that Ms. Fritz did not have any "confounding psychological or secondary gain issues."

22. On August 14, 2002, Ms. Fritz saw Dr. Peter Van Peteghem, a spine specialist and surgeon, for a second opinion. Dr. Van Peteghem diagnosed Ms. Fritz with grade II spondylolisthesis and left L5 lumbar radiculopathy.

23. In Fall 2002, Ms. Fritz's lower back pain, which had been slowly diminishing, became significantly worse. She visited Dr. Knapp a few times to try and address the increasing pain and discomfort, but with no success.

24. On March 5, 2003, Ms. Fritz met with Dr. Van Peteghem to reevaluate her condition and to further discuss surgery. At the appointment, Dr. Van Peteghem decided to proceed with lumbar root decompression surgery.

25. On June 23, 2003, Ms. Fritz left work on disability. She has not returned to work since that date.

26. On June 24, 2003, Ms. Fritz had an L5-S1 lumbar laminectomy and fusion, performed by Dr. Van Peteghem. The surgery consisted of posterior decompression of the bilateral L5 root; posterior stabilization of L5-S1 with a pedicle screw; and a bone harvest from the left iliac crest.

27. After the surgery, Ms. Fritz experienced significant pain in her lower back due to suspected root irritation. At her six-week follow up appointment with Dr. Van Peteghem, Ms. Fritz still experienced this pain and was still using a walker.

28. At her next six-week follow up on September 26, 2003, Dr. Van Peteghem suggested Ms. Fritz return to work in January 2004, on a part-time basis, with the goal of switching to full-time work in April 2004.

29. On November 6, 2003, Ms. Fritz met with Dr. Knapp, during which she noted pain throughout her left leg, numbness in her left foot, and decreased balance. The pain did not

COMPLAINT

subside with changing her position. She reported that she was still unable to drive and sit for prolonged periods, both of which precluded her from returning to work.

30. Despite her ongoing pain, Ms. Fritz told Dr. Knapp that she agreed to return to work in January 2004, in accordance with Dr. Van Peteghem's plan. Dr Knapp suggested that she begin physical therapy at a location closer to her home and referred Ms. Fritz to a Nurse Case Manager, Mary Lou Bradley, to help facilitate her care.

31. During the following months, Ms. Fritz experienced persistent pain in her lower back and pain, numbness, and weakness in her left foot and ankle. She was reevaluated by both Dr. Knapp and Dr. Van Peteghem. Because of her continuing lower back pain and problems with mobility associated with the weakness in her left leg and foot, Dr. Van Peteghem ordered a CT scan and postponed Ms. Fritz's return to work to the summer of 2004.

32. By letter dated March 18, 2004, MetLife approved Ms. Fritz's claim for long-term disability ("LTD") benefits.

33. On May 11, 2004, Ms. Fritz met with Dr. Van Peteghem to review the results of her CT scan. Dr. Van Peteghem suggested Ms. Fritz undergo a second surgery so he could explore the area probed during her first surgery.

34. For a second opinion, Ms. Fritz saw Dr. David S. Bradford at The Spine Center and Orthopaedic Surgery Clinic at the University of California, San Francisco ("UCSF") on August 2, 2004. Dr. Bradford concluded that the L5-S1 spondylolisthesis surgery did not provide her any pain relief nor did it improve her posture. He suggested that Ms. Fritz have a second surgery to explore the area of her prior surgery and possibly remove the bone implants that were inserted.

35. On September 15, 2004, Ms. Fritz met with Dr. Bobby Tay at UCSF Medical Center for a surgery consultation. After conducting a physical examination and reviewing her past x-rays and CT scans, Dr. Tay recommended that she have a CT myelogram and undergo a nerve conduction study in order to discover the cause of her ongoing pain and discomfort.

36. Later on September 15, 2004, Dr. Tay sent a letter to Dr. Knapp in which he diagnosed Ms. Fritz with neuroforaminal stenosis, which he believed "was not properly

1 | addressed at her first surgery."

37. The Social Security Administration determined that Ms. Fritz was totally disabled from any gainful occupation as of October 2004.

38. On October 27, 2004, Dr. Tay reviewed the results of the CT myelogram and nerve conduction study with Ms. Fritz. Neither test provided useful results and Dr. Tay offered to perform a second surgery involving repeat decompression of the L5 nerve root and removal of the implants and scar tissue.

39. Ms. Fritz ultimately conceded that she would need a second surgery and, after contemplating with which doctor to proceed, she selected Dr. Van Peteghem to conduct the procedure.

40. On January 31, 2005, Dr. Van Peteghem performed the second surgery, an L5-S1 exploration of the transformal lumbar interbody fusion ("TLIF") with a bone graft, during which he removed the hardware from her left side and inserted more bone tissue to bolster the fusion. In so doing, he discovered that the L5 nerve root was "very encased with scar," and required "tedious" dissection. The surgery was complicated by a small dural tear (2 mm), which was repaired during surgery.

41. Ms. Fritz struggled in the weeks following her second surgery. While the first post-surgery days were relatively pain free, Ms. Fritz began feeling nauseous and developed spinal headaches resulting from a cerebrospinal fluid leak ("CSF leak") that occurred after the intrasurgery dural tear. Because the CSF leak was causing her great pain and required extended bed rest, Dr. Van Peteghem had Ms. Fritz transferred to the Kaiser hospital in Oakland for an extended hospital stay.

42. After her hospital release in late February 2005, Ms. Fritz began, with the assistance of her husband and mother, what was a very slow recovery. By the summer of 2005, Ms. Fritz had yet to experience a significant reduction in her lower back pain and weakness in her left leg.

43. On August 24, 2005, Dr. Knapp declared Ms. Fritz to be "maximally medically improved." In so doing, he listed Ms. Fritz's permanent restrictions, which limited Ms. Fritz to

COMPLAINT

1 no more than four hours of work per day. He limited her job capacity to sedentary work with occasional walking and position/posture changes for comfort.

44. On December 12, 2005, Dr. Knapp submitted his Maximum Medical Improvement Report ("MMI") to Kaiser's California Workers' Compensation Department. In his report, Dr. Knapp confirmed Ms. Fritz's diagnosis of left L5 lumbar radiculopathy and spondylolisthesis. Dr. Knapp also noted that Ms. Fritz was still experiencing moderate to severe pain in her lower back, still using a cane, and still taking Ultram, Nortriptyline, and Neurontin for her pain.

45. Neurontin is known to have cognitive impairment and peripheral edema as common side effects.

46. Ultram is known to have cognitive impairment, nausea, blurred vision, and insomnia as common side effects.

47. Nortriptyline is known to have fast heart rate, blurred vision, and nausea as common side effects.

48. In his MMI, Dr. Knapp evaluated Ms. Fritz as having "28% impairment of the whole person." He advised that Ms. Fritz is a displaced worker who is "unable to tolerate 8 hours of sitting, standing and walking as required in the course of her usual and customary work."

49. Meanwhile, by letter dated November 28, 2005, MetLife denied Ms. Fritz's claim for continued LTD benefits.

50. The MetLife plan defines disability after the initial 24-month benefit period as "being unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings."

51. Ms. Fritz's predisability earnings were approximately $69,452.03 per year.

52. By a physical capacity evaluation dated July 27, 2005, Dr. Knapp had reported to MetLife that Ms. Fritz still suffered from pain throughout her lower back and left leg, and from weakness throughout her entire left leg. Dr. Knapp stated that Ms. Fritz was only capable of

COMPLAINT

performing four to six hours of sedentary work per day, for a total of twenty to thirty hours of sedentary work per week.

53. By letter dated May 25, 2006, Ms. Fritz appealed MetLife's decision to deny her claim for LTD benefits. In support of her appeal, Ms. Fritz submitted the following documents: a Modified/Alternative Work Assessment conducted by Diversified Management Group ("DMG"); a Qualified Medical Examination performed by Dr. Samuel Wayne; Dr. Brian Knapp's Maximum Medical Improvement Report; and a letter written by Ms. Fritz in response to Dr. Knapp's report.

54. In the Modified/Alternative Work Assessment, dated October 25, 2005, DMG concluded that there was "no permanent modified or suitable alternative work" available to Ms. Fritz under the restrictions set by Dr. Knapp that would net Ms. Fritz 80% of her predisability earnings, as required by the Plan.

55. In the Qualified Medical Examination by Dr. Samuel M. Wayne, dated March 16, 2006, Ms. Fritz was diagnosed with: failed back surgery; continuing left sciatic radiculitis; and grade II spondylolisthesis, L5 vertebrae. Dr. Wayne stated that Ms. Fritz's clinical complaints matched the objective findings in the record. In addition, Dr. Wayne increased Ms. Fritz's whole person impairment to 31%, incorporating an additional 3% for chronic pain. He further concluded that Ms. Fritz was "unable to perform her usual and customary occupation" and that she would require indefinite treatment by spine and pain treatment specialists.

56. In her response letter, Ms. Fritz clarified her course of medication, stated that any back pain she experienced before her fall in July 2001 was only occasional and never reached the significant level it did after her fall and subsequent surgeries, clarified that her first surgery was not originally her idea, but rather a suggestion of Dr. Smith, and noted that she was not able to drive from her home to the Kaiser Vallejo facility on her own.

57. By letter dated June 8, 2006, MetLife acknowledged receipt of Ms. Fritz's appeal.

58. By report dated June 29, 2006, Dr. F. X. Plunkett of Elite Physicians, Ltd., provided MetLife with a functionality evaluation of Ms. Fritz. Dr. Plunkett confirmed Dr. Knapp's findings that Ms. Fritz was limited to four hours of sedentary work each day, with

occasional position changes as necessary for her comfort. He stated that her work restrictions were indefinite, and with a 28% whole person impairment at maximum medical improvement, Ms. Fritz was "not likely to improve."

59. By letter dated July 19, 2006, MetLife upheld its decision to deny Ms. Fritz's claim for continued LTD benefits.

60. Ms. Fritz has exhausted her administrative remedies under the Plan.

61. At all relevant times, Ms. Fritz has been disabled within the meaning of the Plan; Ms. Fritz remains disabled and is entitled to benefits under the terms of the Plan.

## CLAIM FOR RELIEF

[Claim for Benefits Pursuant to ERISA § 502(a)(1)(B)
Against Defendant Plan]

62. Plaintiff incorporates Paragraphs 1 through 61 as though fully set forth herein.

63. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan, and/or to clarify her rights to future benefits under the terms of a plan.

64. At all relevant times, Ms. Fritz has been entitled to long-term disability benefits under the Plan. By denying Ms. Fritz's claim for long-term disability benefits under the Plan, and by related acts and omissions, Defendant Plan has violated, and continues to violate, the terms of the Plan and Ms. Fritz's rights thereunder.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant the following relief:

AS TO THE FIRST CLAIM FOR RELIEF:

A. Declare that Defendant Plan violated the terms of the Plan by denying Ms. Fritz's claim for long-term disability benefits;

B. Order Defendant Plan to pay long-term benefits to Plaintiff pursuant to the terms of the Plan from December 24, 2005, through the date judgment is entered herein,

1 together with prejudgment interest on each and every such monthly payment
2 through the date judgment is entered herein;
3    C.  Declare Plaintiff's right to receive future long-term disability benefit payments
4 under the terms of the Plan;
5    D.  Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein
6 pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g);
7    E.  Provide such other relief as the Court deems equitable and just.

Dated: 7/10/07

Respectfully submitted,

LEWIS, FEINBERG,
RENAKER & JACKSON P.C.

By: _____
Cassie Springer-Sullivan
Attorneys for Plaintiff

COMPLAINT     Page 10